IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2003

## STATE OF TENNESSEE v. SHAWN HODGE

**Appeal from the Criminal Court for Knox County**
**No. 68409     Mary Beth Leibowitz, Judge**

---

**No. E2002-01794-CCA-R3-CD**
**December 8, 2003**

---

Convicted by a jury of first degree murder, the defendant, Shawn Hodge,[1] appeals and claims (1) the evidence is insufficient to support the conviction, (2) the trial court erred in denying a jury view of the crime scene, (3) the trial court erroneously excluded evidence of a threat made against a defense witness, (4) the defendant was prejudiced by an attempt by the state to pay a prosecution witness, (5) the court inadequately instructed the jury on the elements of the offense, and (6) the court erroneously admitted the testimony of an allegedly incompetent defense witness. We affirm the lower court's judgment.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Brandt Davis, Knoxville, Tennessee, for the Appellant, Shawn Hodge.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Marsha Mitchell, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

Between 8:00 and 9:00 a.m. on Sunday, April 26, 1998, Benny Boling was gunned down in the Austin Homes Community of Knox County. Numerous residents and visitors in the community that morning witnessed some or all of the events surrounding the shooting. No murder weapon was ever recovered, and no forensic evidence tied any particular suspect to the homicide. The shooting was believed to be drug related.

---

[1] We note that the defendant's first name appears in the record as both "Shawn" and "Shaun." It is the policy of this court, however, to spell the defendant's name as it appears on the indictment.

During the initial stages of the police investigation, many witnesses were reluctant to become involved or come forward with information. Approximately ten months elapsed before the defendant was arrested and charged with one count of premeditated first degree murder. The state did not seek either the death penalty or life without the possibility of parole. The defendant pleaded not guilty and invoked his right to trial by jury.

We recount the trial evidence in the light most favorable to the state. The state opened its proof with the testimony of Gerald Smith, a senior evidence technician with the Criminal Investigation Division of the Knoxville Police Department. Before joining the ranks of the Knoxville Police Department, Mr. Smith had retired from Tennessee Bureau of Investigation after working 27 years in the crime laboratory.

Mr. Smith testified that he was called at 8:58 a.m. on April 26, 1998, and dispatched to process a homicide crime scene in the area of Austin Homes near the intersection of Mee Street and Hanson Avenue. By the time Smith arrived, the victim's body had been taken to the hospital. The victim's truck had run off the road and had come to rest at the Mee Street-Hanson Avenue intersection. The victim had escaped from the truck and fled approximately 75 feet up a hill before collapsing and dying.

Smith testified that he recovered a combination of seventeen nine millimeter bullet casings and bullet fragments from the crime scene. He explained that the casings indicated that a nine millimeter, semi-automatic handgun had fired the rounds. Smith said that he identified a total of ten rounds of ammunition that had been fired at the truck, five of which entered the cab of the truck. The medical examiner who performed the autopsy turned over to Smith one bullet that had lodged in the victim's left leg and a bullet fragment taken from the victim's left arm. Subsequent testing results, to which the state and defense had stipulated, revealed that the seventeen cartridge casings/fragments had been fired from the same type of firearm and that markings on eight of the casings/fragments showed that they had been fired by the same firearm.

Smith stated that no identifiable fingerprints were found inside the truck and that no weapon was ever recovered. Another investigator at the scene turned over to Smith a $100 bill that the victim had clutched in his hand. Smith testified that based on the bullet holes in the truck, it was his opinion that the shots were fired at a distance of four feet or more from a position slightly to the rear of the driver's side of the truck. Also, in Smith's opinion, the nonlethal wounds to the victim's left leg and arm occurred while the victim was still in the truck. The victim's body had three other wounds, one of which was fatal. The fatal shot entered the right side of the victim's back and exited the front of the chest. Smith was unable to determine which, if any, of the recovered bullet fragments was the fatal bullet.[2]

---

[2] Smith testified that he was present when the victim's autopsy was conducted and that he took photographs of the body.

Doctor Sandra Elkins, Knox County's Medical Examiner, testified and corroborated Smith's identification of the fatal gunshot wound with an entry point on the right side of the victim's back and an exit point on his chest to the left and slightly upward approximately seven inches. Most of the other gunshot wounds that the victim sustained were to the back of his left buttocks and the left leg area; none of the entry wounds were on the front of the victim's body. Doctor Elkins reported that a drug and alcohol screen of the victim's blood showed the presence of a low concentration of alcohol but a high concentration of cocaine.

The state called four witnesses who identified the defendant as the shooter. The theory of defense was that these witnesses had either accidently or intentionally identified the wrong person. The state's witness Debra Turner was in the latter category. Turner had lived for five years at Apartment 161, 1283 Nelson Circle. Her apartment faced Hanson Avenue.

Turner testified that she had known the defendant, whose nickname was "Fat Shawn," most of her life. The defendant formerly lived in Austin Homes, and at the time of the shooting, his grandmother resided in Austin Homes. Turner said that she saw the person who killed the victim. Turner stated that she did not know the victim and had never seen him before the day of the shooting.

Turner testified that shortly before the shooting, she was in her kitchen making preparations for Sunday dinner. She said that she heard voices and an argument outside her back door. Turner claimed that she heard one voice saying, "Dude, you will not leave these projects alive if you don't buy this damn dope from me." Turner gave conflicting testimony whether her back door was open or closed at the time, but at any rate, she stepped to the back door and looked outside. Turner stated that she saw the defendant talking to a white male who was sitting inside a parked truck. The defendant was wearing blue jeans and a "black hoody." Turner testified that she heard the man in the truck tell the defendant that he "did not come to buy no drugs," and then she heard a gunshot and saw the truck moving away from the scene. Turner said that the defendant followed the moving truck and fired into it. The truck hit a fence and stopped. Turner related that the man then jumped out of the truck, and as he was running across the street, the defendant fired at the man. According to Turner, after the man fell, the defendant "stood over him and shot him." Turner described how she watched what happened first from her back door and then from the side and front windows in her apartment. Turner testified that she never heard the victim threaten the defendant and did not see any weapon in the victim's possession.

After the police arrived at the scene, officers began questioning people in the area about the shooting. Turner admitted that she told officers that she had not seen anything, but she insisted that later that night she made a telephone call and anonymously reported what she knew about the crime. It was not until February 9, 1999, that she came forward, gave a statement to the police, and identified the defendant from a photo spread.

On cross-examination, the defense elicited that Turner had two prior theft convictions. The defense also vigorously cross-examined Turner about the line of sight at her back door and windows and about the location of the truck when she first saw it. Turner amended her

earlier testimony and stated that when she first saw the victim, he was outside of the truck talking to Tim Bolden, whose nickname was "Tim Dog." She next saw the defendant approach and threaten the victim, and the shooting began. Turner said that she did not know where Bolden had gone after the first shot was fired.

Turner stated that the reason she did not initially talk with the police officer at the scene was that the defendant was standing nearby at the time and that she was afraid of him. When Turner finally talked with the police, she called them from the University of Tennessee Medical Center. Detectives came to the hospital, transported Turner for questioning, and then took her back to the hospital. Turner admitted that she was at the hospital with her son who had been seriously injured when the defendant and two other men "jumped on him and beat him with a bat." At the time Turner testified, the assault case against the defendant was still pending. Turner agreed that she was angry with the defendant because he had injured her son, and in the statement given to the detectives, she said that she had decided to come forward because her son had been beaten.

Turner maintained that she had not accused the defendant in retaliation for her son's injuries. She denied using cocaine in her apartment with a man named Curry Dixon when she learned about the beating, and she denied telling Dixon that she would "mess" the defendant up because of what he had done to her son. She also denied making any similar statement to the defendant's cousin, Taiwan Fowler.

Patricia Hamilton also identified the defendant as the shooter. Hamilton lived in Georgia at the time of the crime but was visiting with relatives in Knoxville and staying with her cousin, Debra Turner. Hamilton admitted that she had a prior conviction for selling cocaine and was on probation. Hamilton recalled being downstairs, sitting and talking to Turner when the "commotion" began. Hamilton said that she asked Turner if someone was firing a gun. She testified that Turner peeped out of the window and reported that "Fat Shawn" was shooting. Hamilton was certain of the identification because she had known the defendant all of her life. Hamilton also looked out of the window; she saw the victim get out of the truck and run toward the daycare center up the hill with the defendant in pursuit shooting at the victim. Hamilton said that she did not want to get involved in the police investigation and, therefore, stayed inside the house.

A third witness who lived in Austin Homes and identified the defendant as the shooter was Lorraine Young. Young lived at 1240 Nelson Circle, Apartment 187. She knew the defendant and was friends with Debra Turner. Young testified that she was awake Sunday morning but lying in bed when she heard a commotion and went to her bedroom window. Young testified that she saw the defendant and three other boys near the victim's truck having an argument about "dope and money." Young identified one of the other boys by the nickname "Country." Young said that she heard the victim tell the boys that he did not want any more drugs because he had spent all of his money, and she heard the defendant respond that "you're gonna buy my dope or else." At that point, Young put on some clothes and went to the back door in time to see the victim wreck his truck and flee on foot while the defendant shot the victim.

-4-

Young said that after the victim fell and the shooting stopped, the defendant came to her door and wanted to come inside the apartment. When Young declined to grant him entry, the defendant walked away. Young testified that the defendant had a gun in his hand when he came to her door. Young testified that she recalled seeing the victim on Saturday evening when he drove into the neighborhood and purchased drugs from a man who Young identified as "Grill."

On cross-examination, Young testified that on the morning of the shooting she was in bed with her boyfriend. The defense examined her closely about the view out of her bedroom window. Young had given the police a statement in which she said that she and her boyfriend were in bed drunk, but at trial she denied being intoxicated or making that statement to the police. Young did admit that at first she told the detectives that she did not know anything and could not identify the shooter. Young elaborated further that she had seen the victim drive into the neighborhood and purchase drugs approximately five times on Saturday.

Two additional witnesses who testified for the state were Albert Banks and Keesha Towns. Towns lived in Austin Homes when the shooting occurred, and she knew the defendant. Towns was on her back porch Sunday morning and saw approximately eight men gambling on the porch of the apartment directly across from where she was standing. The defendant and Tim Bolden were among the gamblers. Towns testified that "an incident or argument or something broke out and everybody took off running." Towns heard gunshots, but she did not actually see anything happen. She was uncertain whether the defendant had a gun.

Banks testified that he was sleeping in his mother's apartment when he awoke to gunshots on Sunday morning. He peeped out of the window next to the bed and saw a person he did not know shooting a gun. Banks could not recall what the shooter was wearing, and he did not see at whom or what the person was shooting.

The final witness in the state's case in chief was Tim Bolden, known as "Tim Dog." At the time of his testimony, Bolden was serving an incarcerative sentence for voluntary manslaughter, and he had pending drug and reckless endangerment charges. Bolden testified that the state had agreed to a sentence of four years on the pending charges, to run consecutively to his ten-year voluntary manslaughter sentence, in exchange for his truthful testimony.

Bolden testified that he lived in Austin Homes and knew the defendant from the neighborhood. Bolden explained that he was selling drugs in the area on Saturday when the victim spent approximately $600 to $800 on crack cocaine. According to Bolden, the victim made multiple trips into the neighborhood that day to purchase crack cocaine from Bolden. The last time the victim left was around 2:30 or 3:00 on Sunday morning.

Bolden testified that at 5:00 or 6:00 a.m. he saw the defendant. Bolden was gambling with four or five other men, and the defendant joined them. Later, the victim once again drove into the neighborhood, but Bolden did not approach the truck. Instead, the defendant walked toward the truck. Bolden testified that he heard the victim's loud voice, saw the victim pulling out in his truck,

and saw the defendant firing a gun. The defendant, Bolden maintained, was the only person shooting and the only person who had a gun. Bolden testified that he also saw the victim's truck run up on a curb, the victim leave the truck and flee, the defendant continue to shoot, and the victim fall. To Bolden's knowledge, the victim was not armed. Bolden explained that after the shooting stopped, everyone tried to disperse because they knew the police would arrive shortly.

The police captured Bolden and transported him to the police station for questioning. Bolden admitted that at first he did not tell the detectives the truth. Bolden stated that later, however, while he was still in custody, he told the truth that the defendant shot the victim. Asked to explain why he decided to tell the police about the defendant's involvement, Bolden testified, "I really guess I felt that I -- I didn't want to take the blame for it basically. That's the basic answer really. I didn't want to take the blame for it."

Not surprisingly, the defense aggressively cross-examined Bolden, covering credibility issues such as testifying in exchange for sentencing leniency and wanting to avoid being charged with the homicide. The defense also highlighted inconsistencies between Bolden's statements to the police and his trial testimony, particularly as related to location and street names.

The defendant did not testify, but he offered the testimony of nine witnesses.

Renee Stone, who was living in Austin Homes at the time of the shooting, testified that she was driving home the morning of the shooting when a woman stopped her and advised her of the shooting. Stone drove up the hill in front of the daycare center and saw a man lying on his stomach on the ground. Stone went to her apartment and called 911. When she walked back to the scene, the paramedics were arriving. Stone did not witness the shooting or hear any gunshots.

Latroy Askew, who was serving an incarcerative sentence for reckless endangerment and aggravated assault, testified that the night before the shooting he and the defendant rode around all night in Austin Homes. The next morning, Askew recalled being around a group of men gambling, including the defendant and Bolden. According to Askew, the defendant was wearing a yellow sweater with a hood, and Bolden was dressed in black. Askew said that he and the defendant left about the same time, before the shooting. The defendant mentioned going home or to his girlfriend's house. On cross-examination, Askew agreed that he and the defendant were good friends. Askew could not recall what day of the week that the shooting occurred, and he admitted that he was aware of other shootings in Austin Homes.

Defense witness Glenda Ward did not live in Austin Homes and was not familiar with or related to any of the witnesses in the case. In April 1998, Ward was living in Town View Apartments across from Austin Homes on Summitt Hill. Ward testified that she could see the daycare center in Austin Homes from her apartment. Ward recalled that she happened to be looking out of her window one morning and saw one man chasing another man. Ward said that the man in the lead was trying to run up the hill, and the other man shot him. Ward saw the man who was shot fall down, and she saw the shooter run in the oppositive direction toward Austin Homes. Ward

described the shooter as about six feet tall, 190 pounds, and wearing dark clothing. Ward said that she did not get a good look at the face, but she knew "he was like dark-skinned, dark complected." The defendant then stood up in the courtroom, and defense counsel asked Ward if the defendant was the shooter. Ward said that the defendant was not who she saw.

The state sought to discredit Ward's testimony by challenging what she could have seen from her apartment. The police interviewed Ward in 1998 as part of the shooting investigation, and she advised the officers that she witnessed the murder but could not identify the shooter. At that time, Ward described the shooter as a black man dressed in a dark hooded jacket with dark pants. At trial, Ward agreed that she did not mention the shooter's skin tone previously, but she insisted in response to state questioning that from where she was standing, and even though the shooter had the hood of his jacket over his head, she could see the shooter's skin tone, which was dark, not light.

Defense witness Reginald Woodruff testified that he had grown up with the defendant in Austin Homes. At the time of the shooting, Woodruff was living in Town View Apartments across from Austin Homes. Woodruff testified that he was home with his son on the morning of the shooting. The defendant, Woodruff said, came to his apartment dressed in a gold pullover sweater jacket. Woodruff stated that the defendant did not have a weapon with him, and Woodruff recalled that the defendant was acting as if something was wrong. About five or ten minutes later, Malik Hardin showed up at the apartment to play video games with Woodruff. Woodruff estimated that the group stayed in his apartment two hours. After Hardin left, Woodruff said that he, his son, and the defendant left to get something to eat.

On cross-examination, the state exploited the witness's inability to recall when the events occurred, other than possibly on a Sunday. Woodruff was certain that the year was 1998, and he believed it was around the end of the year, after Thanksgiving. The state also tried to raise questions about Woodruff's memory in terms of recalling what the defendant was wearing. Woodruff insisted that he specifically recalled the gold-type sweater jacket "because [his] son kept calling him big bird."

Austin East High School student Pierre Jarrett was thirteen years old at the time of the shooting. On the day of the crime, he was playing basketball in the Austin Homes neighborhood, and he saw a gray truck going up the hill by the daycare center. The truck turned, and Jarrett said that he heard approximately ten gunshots. Jarrett testified that at the sound of the shots, he looked up the hill and saw that the truck had come to rest with the passenger side door open. Jarrett stated that he also saw a man dressed in black who had a gun. Jarrett told the police what he had seen when he was interviewed. Jarrett said that he was positive that the defendant was not the man he saw with the gun in his hand. The state cross-examined Jarrett to bring out inconsistencies between his testimony and his police statement, including the differences in how he had described the shooter.

Paul Chandler was almost caught in the gun fire on Sunday morning. This 70-year-old witness was retired from the United States Army after 24 years of service. He lived within walking distance of Austin Homes, where he frequently went to collect discarded cans to later sell.

Chandler testified that he was at the top of the hill near the daycare center. He set down a garbage bag of cans and lit a cigarette. Chandler said that he heard a vehicle and shooting. He explained that he could not see who was doing the shooting and that he was afraid to move. Chandler believed that if he had not stopped to take a break, he would have been between the truck and the shooter. Chandler testified that he saw the victim get out of the truck, run past him, turn a corner, and then collapse.

Chandler described the shooter as tall and thin and wearing a brown cap and jacket. When the police arrived, Chandler pointed out the direction in which the shooter headed. At trial, Chandler said that as the shooter walked off, Chandler heard him say, "I got him." The defendant stood up in the courtroom, and Chandler stated that the defendant was not the shooter. The state questioned Chandler at length about a photo spread he was shown by the police; evidently, he had identified as the shooter a man who was in prison at the time of the shooting. The state also elicited from Chandler that the shooter he saw was carrying a .357 Magnum handgun.

The defense called two witnesses who testified specifically about Debra Turner and statements she had made about identifying the shooter. The first witness, Curry Dixon, was serving a sentence for robbery. He had known the defendant all his life. Dixon testified that one evening he and Turner were smoking crack at her house. Dixon recalled that someone knocked on the door and advised Turner that her son had been beaten. Turner left and returned a short time later. Dixon stated that when she returned, Turner threatened that she was going to implicate Fat Shawn in a murder, even though the defendant was not involved.

Defense witness Taiwan Fowler related a similar conversation that he had with Turner. Fowler was related to the defendant but had never lived in Austin Homes. Fowler testified that he had known Turner for several years and that he did not believe her to be truthful. Fowler said that he had spoken to Turner within the past year and that she was going to give an untruthful statement to get back at the defendant for putting her son in the hospital.

The final defense witness was Malik Hardin, the defendant's cousin. He testified that he was with the group of men gambling on the porch of the apartment in Austin Homes early Sunday morning. Hardin said that the defendant was present also gambling. A truck drove into the area, and Hardin recognized it and the man driving because Hardin and "Tim Dog" had been selling the man drugs the previous evening. Hardin related how the shooting began. He stated that he, "Tim Dog," and a third man, "Wutang," were walking toward the truck. "Tim Dog" asked the other two men to "back him" because the man in the truck had "shorted him for money." Hardin said the victim had a $100 bill and that Hardin was "about to serve him" when "Tim Dog" pulled out a gun, told the other two to back up, and started shooting. Hardin ducked to the ground; he said that he heard five to seven shots and then took off running. While running, Hardin heard approximately eight more shots.

Hardin testified that the last time he saw the defendant, the defendant was still gambling. Hardin ended up first at a crack house, and then he encountered Reginald Woodruff.

Hardin stated that the two men went to Woodruff's house where the defendant and Woodruff's son already were. Hardin did not recall how the defendant was dressed. Around noon, Hardin left Woodruff's house; the defendant was still there. Hardin said that he was going to his sister's place in Austin Homes. His visit, however, was interrupted by the police who took him into custody. Hardin stated that he could not recall giving a statement to the police.

The state cross-examined Hardin about his prior record, which included two felony drug convictions and two attempted robbery convictions. In addition, Hardin was currently serving a federal sentence involving a gun charge. The state questioned why Hardin did not come forward with the information earlier. Hardin responded that he was not a "snitch" and that he was fearful of what might happen to his family. Hardin said that he had changed his mind because his grandmother had since died and most other family members were now in jail. The state again took Hardin through the events leading up to the shooting. Hardin insisted that the victim came "to buy dope" and was about to spend $100 when "Tim Dog" intervened and began shooting.

In rebuttal, the state called Officer Russell Whitfield of the Criminalistics Division. He identified various photographs that he had taken showing different parts of the Austin Homes area. Officer Whitfield also testified that he went into a third-floor apartment in Town View Apartments and took photographs in the direction of Mee Street. Although it is difficult to follow Officer Whitfield's testimony, it appears that his testimony was offered in an effort to contradict the testimony of the defense witnesses who testified that they had seen the shooting from their respective residences in Town View Apartments.

The jury deliberated over the foregoing evidence and found the defendant guilty of premeditated first degree murder.

### Sufficiency of the Evidence

In his first issue, the defendant challenges the legal sufficiency of the evidence at trial. Specifically, the defendant maintains that the state failed to introduce any evidence showing the exercise of reflection and judgment by the defendant after his mind was free from the influence of excitement or passion. According to the defendant, the evidence about the number of shots fired and Turner's testimony that she heard the defendant threaten the victim are legally inadequate to prove the element of premeditation. The defendant also points to the inconsistencies in the testimony of the state's witnesses and the obvious prejudice of certain witnesses, most notably Debra Turner. The state counters that the defendant's weight-and-credibility-of-the-witnesses argument "intrudes into the determinations made by the trier of fact" and, therefore, should be rejected. Further, the state points out that multiple gunshots can be one of many relevant circumstances in support of premeditation. Because we agree with the state's assessment, the defendant's first degree murder conviction must be affirmed.

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage

point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

First degree murder is committed by one who kills another premeditatedly and intentionally. Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation involves "an act done after the exercise of reflection and judgment [and] means that the intent to kill must have been formed prior to the act itself[, although] it is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. § 39-13-202(d) (2003).

Our legislature has directed that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id*. § 39-13-202(d) (2003). However, "no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan," *State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992); the focus remains on the process "'of thinking about a proposed killing before engaging in the homicidal conduct,'" *id*. at 541 (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *Brown*, 836 S.W.2d at 541; *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). Various facts may allow a jury to infer premeditation, such as:

(1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is planning activity;

> (2)  facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
>
> (3)  facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (quoting 2 W. LaFave and A. Schott, Jr., Substantive Criminal Law § 7.7 (1986)).  Moreover, Tennessee courts have identified relevant circumstances and considerations as including "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing."  *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

Many of the premeditation-relevant factors appear in this case.  The unarmed victim was no match for the nine millimeter, semi-automatic handgun wielded by the defendant.  Before the shooting started, the defendant declared his intent to kill the victim unless the victim bought the defendant's "damn dope."  The killing was particularly cruel with the victim literally running for his life trying to escape the barrage of bullets fired at and into his body.  We agree that repeated blows or shots inflicted on a victim are not sufficient alone to establish first degree murder.  *See Brown*, 836 S.W.2d at 542.  It is, nevertheless, one of the relevant circumstances, when combined with others, that allows the jury to infer premeditation.  Perhaps the state said it best in its brief:  "An individual does not shoot at another seventeen times, pursuing the victim after he has been wounded and going so far as to stand over his fallen body and firing again, unless the desire to murder has been coldly hatched prior."

Taking all of the circumstances in the light most favorable to the state and without second-guessing the jury's credibility determinations, we find that a rational jury could have found beyond a reasonable doubt that the defendant acted with premeditation.

**Crime Scene Viewing**

In his next issue, the defendant argues that the trial court erred in denying the jury's request to visit the scene of the shooting.  We begin with an overview of how the issue arose and was handled.

After deliberations were underway in this case, the jury sent a note to the trial court.  The note reads as follows:

> 1      Exhibit # 22 when taken.

> 2        Would like to view the scene from D.Turner - L. Young -
> Residence

The note was signed by the jury foreperson.

The record reveals that the trial court brought the parties into the courtroom, outside the presence of the jury, to discuss the note. It is unclear from the transcripts whether the note was passed to counsel for inspection. The trial court advised, "And for the record that question is they would like to know if they can go to the scene and look in the residences and see the view from the residences." The trial court stated that it wanted to research the question overnight and then give the jury an answer.

The jury was brought into the courtroom, whereupon the trial court addressed the jury, in relevant part:

> The second question, whether or not we can go and view this scene, in effect, is a question I can't answer tonight. It's going to require a little legal research, and we are going to have to do that and it's going to take some time. It's 7 o'clock. Even if -- even if the answer to that question were to be yes we can't do it at this time because there's no -- you can't see what it is you're asking to look at.

The trial court offered the jury the choice of deliberating further that evening or adjourning so the jurors could eat and get some rest. The foreperson then stated, "I think we have decided that we would like to, if possible, view the scene -- (Inaudible phrase due to coughing in the jury box)." [Sic]. The trial court reiterated that "[w]hether or not you do that is going to have to be a decision I have to make in the morning," and when the foreperson again tried to speak, the trial court interrupted to keep the question focused on deliberating or breaking for the evening. The decision was to retire and resume deliberations in the morning.

The jury was excused for the evening, but the trial court and the parties continued to discuss the matter. Among the questions raised were whether the defendant's consent was required to allow the jury view, whether the defendant was required to be present if a jury view was conducted, and how to secure permission to enter the residences.

The next morning, the trial court informed the parties that it would be inappropriate to permit a jury view because the proof was closed and deliberations had commenced. Defense counsel said, "I agree with that" and added, "I was going to object to it anyway." The parties and the trial court then agreed to bring the jury in and respond that the request was being denied as inappropriate based on the legal research that had been done. The jury, however, pre-empted the plan by informing the court that it had reached a verdict.

The issue was revisited at the new-trial-motion hearing.  At that hearing, the jury's note was made an exhibit, and the question arose whether the note had been shown to counsel at the time of trial.  Neither defense nor prosecution counsel recalled actually seeing the note.  Defense counsel claimed that it was unclear at the time which residences the jury wanted to view; defense counsel said that he was under the impression it was the Town View Apartments outside of the Austin Homes neighborhood.  The trial court, however, reminded defense counsel that they had discussed Austin Homes and the corresponding logistical problems that the location created, after which the following exchange took place:

> MR. DAVIS:          I remember you saying they wanted to go to Austin Homes.
>
> THE COURT:          That's correct.
>
> MR. DAVIS:          Yes.
>
> THE COURT:          And that was a -- that was a major problem. Okay.  Go ahead.  I think we kind of covered it.

Against this background, we observe that the trial court neither rejected nor granted the jury's request to visit the scene.  The trial court had not yet responded at the time the jury sent word that it had reached a verdict.  To be sure, the trial court advised the parties that it intended to deny the request, but that ruling had not been communicated to the jury.  We fail to see how the trial court's unannounced intentions could have affected the jury's deliberations or be regarded as prejudicially erroneous.

The jury's verdict, in our opinion, rendered its earlier request moot.  It is, accordingly, unnecessary for us to explore the intricacies, rules, and procedures that should apply when a request, from whatever source, is made for jurors to view a crime scene.

**Hand Written Threat**

In his third issue, the defendant maintains that the trial court erroneously excluded a handwritten note advising/threatening defense witness Paul Chandler to keep his mouth closed.  The defendant maintains that the note was relevant as circumstantial evidence that Tim Bolden was trying to intimidate Chandler, who was anticipated to identify Bolden at trial as the shooter.

The defendant, in our opinion, waived this issue at trial when he withdrew his attempts to have the note entered into evidence.  *See* Tenn. R. App. P. 36(a).  The transcripts before us reveal in pertinent part the following:

> Q     Have you received any threats in this case?  Have you been threatened in this case?

A        Huh-uh.  (Negatively)

Q        Let me show you this.  Have you ever seen this before?

A        Uh-huh.  (Affirmatively)

Q        Have you ever seen that, Paul?

A.       Yes, sir.

Q        What is that?

A        It come out of my mail box.

. . . .

Q        What does it say?  Can you read it?

A        Telling me to keep my mouth closed.

Q        Do you know who sent that?

A        Huh-uh.  (Negatively)

At that point, the state objected that the note had never been disclosed in discovery. A bench conference ensued during which the following occurred:

MR. DAVIS:         I'm not sure that's in the realm of discovery.
It's a death threat.

THE COURT:         I'm not even sure that it has anything to do
with the case.

MR. DAVIS:         Okay.  (Inaudible comment).

THE COURT:         When did he get it?  Where did it come from?

MR. DAVIS:         I'm going to ask him that.

. . . .

THE COURT:         Well, I think you have to make it relevant, and
I don't think it is.

-14-

MR. DAVIS:          Okay. Okay.

THE COURT:          I'm not sure I want you even to get into it
unless –

MR. DAVIS:          Okay. Forget it.

(Whereupon, said bench conference was concluded, and the following
proceedings were had, to wit:)

The defendant did not proffer the note for the record or proffer any additional testimony by Chandler about the note. Simply stated, the defendant is not entitled to relief on this issue. *See State v. Hall*, 958 S.W.2d 679, 691 n.10 (Tenn. 1997) ("Not only does [an offer of proof] ensure effective and meaningful appellate review, it provides the trial court with the necessary information before an evidentiary ruling is made. Indeed, generally, if an offer of proof is not made, the issue is deemed waived and appellate review is precluded.").

Chandler testified that he did not know who sent the note, and we discern from the record that no additional questioning of Chandler was ever going to establish a proper foundation to admit the writing. The defendant, in effect, received a windfall, not a setback, as an earlier-made objection by the state to Chandler's testimony would have been well taken.

### Witness Payment

Included in the defendant's brief on appeal are three issues that defense counsel writes are being raised *pro se*.[3] In his first issue, the defendant argues that he was prejudiced because officers attempted to pay Keesha Towns to testify against him.

Towns was a witness for the state who did not identify the defendant as the shooter. Towns testified that she heard gunshots, but she did not actually see anything happen. Towns's primary contribution to the case stemmed from her presence on her back porch Sunday morning, seeing across the way a group of men, which included the defendant and Bolden, who were gambling, and later seeing a group of men running toward her.

During the defense cross-examination of Towns, she was asked if the police had promised to pay her to testify in the case. Her rather convoluted response was that someone whom she could not recall told her that "there will be a check written out for me, for me to go to the DA's

---

[3] The inclusion of these issues on appeal is in harmony with the principle that our court does not recognize the represented appellant's right to file a separate appellate brief. *See State v Burkhart*, 541 S.W.2d 365, 371 (Tenn. 1976); *Kenneth Campbell v. State*, No. 01C01-9409-CR-00321, slip op. at 3 (Tenn. Crim. App., Nashville, June 1, 1995); *Bobby Roberson v. State*, No. 02C01-9203-CC-00069, slip op. at 16 (Tenn. Crim. App., Knoxville, Dec. 1, 1993). From the record, we note that these issues were brought to the trial court's attention and were considered and rejected by the trial court.

office the day that I came here." Towns continued that when she went "it was told to me that I wouldn't get paid if I was not testifying against [the defendant]." On redirect, Towns said that she went to the district attorney's office and asked the receptionist for a check. The receptionist, according to Towns, told her that she would not be paid. Towns admitted the possibility that she may have misunderstood and that the receptionist may have been referring to witness reimbursement for mileage.

Given the state of the record, we are not persuaded that Towns was offered any money to give false testimony. Towns's explanation is unclear, and she could not even identify who told her that a check would be written. In essence, the record shows no basis in fact to support any legal argument that the defendant's trial was unfair or that he had been victimized by the prosecutorial misconduct.

### Jury Instructions

The second *pro se* issue is that the trial court erred in failing to instruct the jury on the necessity of proving all elements beyond a reasonable doubt. We are not directed to any specific part of the trial court's jury instructions asserted to be deficient. This generic argument is inadequate to permit appellate review and will be treated as waived for failure to support it with citations to authorities and appropriate references to the record as required by Rule 10(b) of the Rules of the Court of Criminal Appeals. At any rate, the trial court's instructions appear to track the Tennessee Pattern Instructions, and we discern no deficiencies.

### Testimony of Lorraine Young

In his final *pro se* issue the defendant argues that he was prejudiced by the testimony of alleged mental patient Lorraine Young. The record in this case contains no reference to, mention of, or corresponding objection about Lorraine Young's mental status. There being no factual support for this issue, it is rejected and needs no further discussion.

### Conclusion

Our review of this rather lengthy trial convinces us that it was ably prosecuted and aggressively defended. The issues were well defined and required the jury to carefully assess the credibility of the witnesses who testified. The evidence was legally sufficient for the jury to convict the defendant of first degree murder, and nothing else that occurred during the proceedings merits a retrial. The judgment of the trial court is, therefore, affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-16-